Filed 2/18/26  P. v. Lopez CA2/6

## NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION SIX

| | |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>v.<br><br>KATHIA COREAS LOPEZ<br>and ANTONIO ORELLANA,<br><br>    Defendants and Appellants. | 2d Crim. No. B338093<br>(Super. Ct. No. PA097455)<br>(Los Angeles County) |

Kathia Coreas Lopez and Antonio Orellana appeal their convictions, by jury, of the first degree murder (Pen. Code, § 187, subd. (a))[1] and second degree robbery of Bryan Cojon. (§ 211.)  The jury further found that each appellant personally used a deadly weapon, a knife, during the commission of each offense.  (§ 12022, subd. (b)(1).)  The trial court sentenced each appellant to state prison for a total term of 26 years to life.

---

[1] All statutory references are to the Penal Code unless otherwise stated.

Appellants contend the trial court erred in admitting into evidence statements Lopez made to an undercover officer who was posing as a fellow inmate while Lopez was being detained in a holding cell. They further contend references made by the prosecutor to appellants' El Salvadoran national origin violated the California Racial Justice Act ("RJA") (§ 745), and that the trial court erred when it denied them a hearing on that claim. Finally, appellants contend the trial court erred in instructing the jury on the distinction between first and second degree murder because its instructions inadequately defined the term "premeditation." We affirm.

*Facts*

Lopez immigrated with her parents to the United States from El Salvador. Her parents made her leave the family home after she became involved with Mara Salvatrucha or M.S. 13, a criminal street gang with ties to El Salvador. After leaving her parents' home, Lopez lived in Pacoima with several other Salvadorans, including appellant Orellana and J.S., a juvenile. Lopez had a job at a fast-food restaurant and was also a sex worker who solicited customers on Instagram. After exchanging Instagram and text messages with him, Lopez arranged to meet 20-year-old Bryan Cojon at a gas station for paid sex. Lopez, Orellana and J.S. planned to rob Cojon instead.

Cojon borrowed his uncle's minivan and met Lopez at the gas station. Surveillance video shows Lopez getting into the van. The van left the gas station and parked around the corner. Surveillance video shows Orellana and J.S. arrive and approach the area where the van was parked. Two days later, Cojon's body was found in a ravine off La Tuna Canyon Road, in an area known for illegal dumping. The minivan was found that same

2

day, abandoned just over one mile from the house where Lopez, Orellana and J.S. were living.

Searching the van, criminalists found a bloody print on the back door, a pool of blood matching Cojon's DNA, an opened but unused condom and an area where some of the van's carpeting had been cut away. Fingerprints lifted from the exterior of the van belonged to Orellana and J.S.

Cojon had two serious stab wounds to his left thigh. The fatal wound was four inches deep and severed the femoral artery, resulting in massive blood loss. The second wound was also on Cojon's left thigh, closer to the knee, and was about two inches deep. That wound did not strike any major blood vessel. The medical examiner estimated Cojon could have survived for 45 minutes to three hours after the stabbing. Had he received medical treatment, it would have been possible for Cojon to survive these wounds. There was a third, more superficial cut on Cojon's shin.

Cojon's father reported him missing when he did not come home or show up for work the next day. When detectives came to his house, Cojon's father gave them the victim's Apple Watch and passcode. This allowed detectives to find text messages connecting Cojon to Lopez and setting the time and location for their meeting. Location history from the device Lopez used to communicate with Cojon showed that, around the time of Cojon's death, Lopez's device was near the gas station where she had instructed Cojon to meet her. The device then moved around the corner for several minutes. It then moved very fast away from the gas station and on to the freeway, stopping at the area where Cojon's body was found. After some time, the device moved back to the area near the gas station.

3

About one week after the murder, Lopez, Orellana and J.S. were arrested. Detectives seized Orellana's cell phone which contained evidence linking him to M.S 13. It also contained text messages between Lopez and Orellana's girlfriend in which they discussed how to use Cojon's stolen credit cards. While in custody, Orellana made recorded phone calls to his girlfriend. In one call, the girlfriend asked Orellana why he had been arrested. Orellana replied that he was accused of murder. She asked what evidence the police had against him and Orellana replied, "They have everything, evidence, everything, everything, my hands, everything." Orellana also confirmed that his nickname was Chaparro. He also told his girlfriend, "I already confessed that I had done it."

After her arrest, Lopez was placed in a holding cell with an undercover police officer who was posing as an inmate. Their lengthy conversation was recorded and transcribed. When the agent first asked Lopez why she had been arrested, Lopez expressed uncertainty and suggested it must have something to do with her "brothers," appellant Orellana and J.S. Lopez described herself as a low ranking member of M.S. 13 and her "brothers" as full-fledged members of the same gang. She believed the gang would kill her if they knew she was talking about what happened.

When the agent asked again why Lopez had been arrested, she smiled and whispered that she was involved in a killing. Lopez explained that one of her "brothers," didn't "like" the victim because he was a member of a rival gang. They ended up stabbing the victim in the leg. Lopez said that she also stabbed the victim and that she tried to strangle him with the seatbelt because he was moving around too much. Then, the

4

group threw Cojon's body in a ravine. After the stabbing, Orellana licked the victim's blood. Lopez later described Orellana as "a fucking psycho" who "licked the fucking blood."

Lopez told the agent that she and her accomplices wore gloves during the murder because they were inside the victim's van. They tried to avoid being identified by using alcohol to clean the van, cutting out the bloodstained carpet and disposing of some other evidence like the victim's iPhone.

During the conversation, a detective entered the holding cell and handed Lopez a flyer describing the murder. The flyer included photos of Lopez, Orellana and J.S. and described them as suspects in a murder and members of M.S 13. Reviewing the flyer, Lopez identified Orellana with the nickname, "Chaparro." She told her cellmate that the murder occurred during an attempted robbery, that Orellana did the stabbing and J.S. drove the van.

Lopez also explained that she and her "brothers," Orellana and J.S. had committed other, similar robberies. She would arrange to have victims meet her at a gas station or street corner for paid sex. When the victim arrived, she would let the victim get high while she stayed sober, then have them move to a more isolated location where Orellana and J.S. would rob them.

In her trial testimony, Lopez denied stabbing Cojon. The medical examiner found no indication that anyone had tried to strangle Cojon with a seatbelt or other instrument. Lopez testified that she had exaggerated her role in the killing to her cell mate because she was scared and wanted to make the agent afraid of her. Lopez claimed she lied about her role in the stabbing during her interview with detectives because they suggested that talking might help her avoid a life sentence.

*Discussion*

1. Appellant Lopez's Statements to the Undercover Agent.  Lopez contends the statements she made to the undercover agent should have been suppressed because she did not receive *Miranda*[2] warnings and because police coercion and deception made her statements involuntary.  Orellana contends the trial court violated his due process rights by admitting Lopez's statements against him because her statements were coerced and unreliable.  These contentions lack merit.

First, *Miranda* warnings were not required in these circumstances.  *Illinois v. Perkins* (1990) 496 U.S. 292 (*Perkins*) established that, "*Miranda* warnings are not required when the suspect is unaware that he is speaking to a law enforcement officer and gives a voluntary statement." (*Id.* at p. 294, italics added.)  As the Court explained, "Conversations between suspects and undercover agents do not implicate the concerns underlying *Miranda*.  The essential ingredients of a 'police-dominated atmosphere' and compulsion are not present when an incarcerated person speaks freely to someone whom he believes to be a fellow inmate.  Coercion is determined from the perspective of the suspect.  [Citations.]  When a suspect considers himself in the company of cellmates and not officers, the coercive atmosphere is lacking." (*Id.* at p. 296.)

California courts have agreed.  As the court explained in *People v. Tate* (2010) 49 Cal.4th 635, the aim of *Miranda* "is to ensure that the suspect's will to remain silent is not overborne by the coercive atmosphere of *police questioning* in custody.  Both 'custody' and 'police questioning' are necessary to invoke *Miranda*, and both concepts are viewed from the suspect's

---

[2] *Miranda v. Arizona* (1966) 384 U.S. 436 (*Miranda*).

6

perspective. [Citation.] Even when the suspect is in the process of a custodial interrogation, voluntary statements to someone the suspect does not believe is a police officer or agent, in a conversation the suspect assumes is private, simply does not involve one of these two critical concerns." (*Id.* at p. 686; see also *People v. Fayed* (2020) 9 Cal.5th 147, 165-166 [incriminating statements made to cellmate working as a government agent did not require *Miranda* warnings and were not involuntary where the cellmate's "questions or tactics were [unlikely] to procure an untrue statement or were otherwise improper"]; *People v. Gonzales & Soliz* (2011) 52 Cal.4th 254, 284 [*Miranda* warnings not required before conversation with fellow inmate because incriminating statements "were voluntary and free of compulsion"].)

Second, we are not persuaded that appellant Lopez's statements were coerced or otherwise involuntary. Whether Lopez's statements were voluntary, depends on "the totality of the circumstances. We accept a trial court's factual findings, provided they are supported by substantial evidence, but we independently review the ultimate legal question." (*People v. Scott* (2011) 52 Cal.4th 452, 480 (*Scott*); see also *People v. Guerra* (2006) 37 Cal.4th 1067, 1092-1093, disapproved on other grounds in *People v. Rundle* (2008) 43 Cal.4th 76, 151.)

As the Court noted in *Perkins,* "*Miranda* forbids coercion, not mere strategic deception by taking advantage of a suspect's misplaced trust in one he supposes to be a fellow prisoner." (*Perkins, supra,* 496 U.S. at p. 297.) A statement is involuntary if it is """extracted by threats or violence, obtained by direct or implied promises, or secured by the exertion of improper influence. . . ."" (*People v. Linton* (2013) 56 Cal.4th 1146, 1176,

quoting *People v. Williams* (1997) 16 Cal.4th 635, 661; *People v. McWhorter* (2009) 47 Cal.4th 318, 347.)

Here, although it is undisputed that law enforcement used deception to obtain Lopez's statements, there is no substantial evidence that this deception was "of a type reasonably likely to produce an untrue statement." (*Scott, supra,* 52 Cal.4th at p. 481.) For example, the undercover officer did not threaten Lopez or offer her any benefit in exchange for continuing their conversation. She didn't try to intimidate Lopez or pretend to offer Lopez any advice. The transcript of their conversation discloses that, in addition to describing the crime and identifying her accomplices, Lopez volunteered extensive information about her family, her gang membership, her sex life and her living arrangements. On many occasions, Lopez laughed as she spoke to the officer. There is nothing to suggest her will was overborne by coercion. The trial court did not err in admitting Lopez's statements to the undercover agent.

2. Racial Justice Act. Appellants contend the prosecuting attorney violated the Racial Justice Act (RJA) by referring to their El Salvadoran ethnicity during her cross-examination of Lopez and in her closing argument. The trial court denied the motion without a hearing, finding that appellants had not made the requisite prima facie showing. There was no error.

Section 745 provides that the state "shall not seek or obtain a criminal conviction or seek, obtain, or impose a sentence on the basis of race, ethnicity, or national origin. A violation is established if the defendant proves, by a preponderance of the evidence" that an attorney in the case "exhibited bias or animus towards the defendant because of the defendant's race, ethnicity

8

or national origin," or used "racially discriminatory language about the defendant's race, ethnicity, or national origin . . . , whether or not purposeful." (*Id.*, subd. (a)(1), (a)(2).)  The use of discriminatory language does not violate the statute if "the person speaking is relating language used by another that is relevant to the case or if the person speaking is giving a racially neutral and unbiased physical description of the suspect." (*Id.*, subd. (a)(2).)  Racially discriminatory language includes language that, "to an objective observer, explicitly or implicitly appeals to racial bias, including, but not limited to, . . . language that references the defendant's physical appearance, culture, ethnicity, or national origin." (*Id.*, subd. (h)(4).)

If a defendant makes a motion during trial, "and the defendant makes a prima facie showing of a violation of subdivision (a), the trial court shall hold a hearing." (§ 745, subd. (c).)  In this context, the term "prima facie showing" means "the defendant produces facts that, if true, establish that there is a substantial likelihood that a violation of subdivision (a) occurred. For purposes of this section, a 'substantial likelihood' requires more than a mere possibility, but less than a standard of more likely than not." (*Id.*, subd. (h)(2).)

Here, appellants contended in the trial court that the prosecuting attorney violated the RJA during her cross-examination of Lopez and during her closing argument by focusing on Lopez's national origin, on her membership in a gang that originated in El Salvador, and on the references Lopez made to witchcraft in her conversation with the undercover agent.  She contends the prosecutor implied that witchcraft and violence were attributable to Lopez's national origin.

9

For example, Lopez told the undercover agent that Orellana stabbed the victim because the victim was from a rival gang, 18th Street. The prosecutor asked Lopez whether she knew, "that one of the main rivals that M.S. 13 has is 18th Street. Correct?" Lopez answered, "Yes." She also knew that there were members of 18th Street in El Salvador. Lopez agreed that 18th Street and M.S. 13 were rivals "even in [Lopez's] home country." The prosecutor also referred to Lopez's claim that Orellana licked the victim's blood. She asked, "And is that because of some type of, as you called it, 'Brujeria'? The witchcraft?" Lopez answered, "No." She also denied that licking blood is "part of what M.S. 13 does when they kill someone[.]"

In her closing argument, the prosecutor stated, "And she [Lopez] laughs about Antonio [Orellana] licking the victim's blood after the murder. I mean, how wrong is that? You kill someone in cold blood, and you lick their blood. To what? To taste your victory? [¶] That is who these people are over there."

Appellants contend these comments make a prima facie showing of an RJA violation. In their view, the prosecutor inferred that people from El Salvador are more violent, callous and willing to harm others because they come from a country that practices witchcraft, where killers lick the blood of their victims, and where the violent gang, M.S. 13, originated. They further contend the phrase, "That is who they are over there," referred to Salvadorans and was intended to separate Salvadorans into a "despicable" group and to dehumanize them.

In opposing appellants' RJA motions, the prosecutor explained that the questions regarding witchcraft and licking the victim's blood were references to the behavior of M.S. 13 members, not to persons from El Salvador. Similarly, the

10

statement in closing argument referred to appellants' conduct in this case, not their national origin. The prosecutor described Lopez's callous attitude toward the killing, noting that she laughed while describing the dress she wore during the killing and Orellana licking the victim's blood. In the next sentence, the prosecutor stated, "That is who these people are over there." This was a reference to appellants' behavior and to the activities of M.S. 13, not to the people of El Salvador.

The trial court denied the motion, concluding appellants had not made a prima facie showing of an RJA violation and were not entitled to an evidentiary hearing on the issue. It found that the prosecutor "was referencing some of the acts that the [appellants] committed and referenced and kind of linked that into them being members of Mara Salvatrucha."

We agree with the trial court. Appellants did not make a prima facie showing that the prosecuting attorney violated the RJA. First, the prosecutor questioned Lopez about statements Lopez made to the undercover agent regarding her birthplace in El Salvador and appellants' association with M.S. 13, witchcraft and blood licking. These questions were based on Lopez's own statements and related directly to her description of each person's actions during the robbery and murder. Statements do not violate the RJA if "the person speaking is relating language used by another that is relevant to the case . . . ." (§ 745, subd. (a)(2).) Moreover, the questions do not invite an objective observer to infer that people from El Salvador are violent gang members who engage in or believe in witchcraft. Instead, they remind the observer that Lopez described herself and her co-defendant in those terms. Consequently, these questions do not establish a "substantial likelihood that a

11

violation of subdivision (a) occurred," and therefore do not make a prima facie showing that the RJA has been violated. (*Id.*, subd. (h)(4).)

We reach the same conclusion with regard to the prosecutor's closing argument. The statement, "That is who these people are over there," does not refer expressly to appellants' national origin, ethnicity or immigration status. In fact, at no point in her closing argument did the prosecutor refer appellants' race, ethnicity, national origin or immigration status. Read in context, the prosecutor was arguing that Lopez behaved callously after the crime, bragging and laughing about her role in it and the "psycho" things her co-defendant did. An objective observer would not understand the phrase, "[t]hat is who these people are over there," to refer to all Salvadorans or even to appellants' national origin. The more straight forward understanding of the phrase is that it refers to the callousness and cruelty of the people on trial – that the appellants are people who engage in the cruel behavior shown by the evidence at trial, not that they are cruel or violent because of their national origin or ethnicity.

Appellants contend this analysis goes beyond the court's proper role in determining whether appellants made a prima facie showing of an RJA violation. At the prima facie stage, the court "should accept the truth of the defendant's allegations . . . unless the allegations are conclusory, unsupported by the evidence presented in support of the claim, or demonstrably contradicted by the court's own records." (*Finley v. Superior Court* (2023) 95 Cal.App.5th 12, 23.) Ultimately, the question is whether "the motion and its supporting evidence state facts that, '*if true*, establish that there is a substantial likelihood

that a violation' occurred . . . ." (*Id*. at pp. 23-24, quoting § 745, subd. (h)(2).) The court "should not weigh the evidence or make credibility determinations, except in the rare case where the record 'irrefutably establishes' that a defendant's allegations are false." (*Id*. at p. 24.)

But accepting appellants' factual allegations as true does not require us, or the trial court, to accept appellants' conclusions as true. Here, the facts are the prosecutor's questions and argument, as well as the context provided by the evidence at trial. Appellants' contentions that the prosecutor's comments "othered" them, were references to their national origin or exhibited bias are conclusions derived from those facts and need not be accepted as true. (See, e.g., *People v. Quintero* (2024) 107 Cal.App.5th 1060, 1076-1078 [rejecting appellants' characterization of "'predator'" and "'monster'" as "dehumanizing" and violative of the RJA].) The record here demonstrates that the trial court accepted appellants' factual claims as true but disagreed with their conclusion, as do we. There was no error.

3. Instructional Error. Appellants contend the trial court erred in instructing the jury on the distinction between first and second degree murder. Appellants contend that CALCRIM No. 521 and CALCRIM No. 526 provide the jury with an incorrect definition of "premeditation," because the pattern instructions do not inform the jury that premeditation requires "substantially more reflection" than the intent required for second degree murder.

"'"A trial court has a duty to instruct the jury 'sua sponte on general principles which are closely and openly connected with the facts before the court.'"'" (*People v. Aguirre* (2025) 18 Cal.5th 629, 677, quoting *People v. Gutierrez* (2009) 45

13

Cal.4th 789, 824.)  However, the court has no duty to "revise or improve upon an accurate statement of law without a request from counsel [citation], and failure to request clarification of an otherwise correct instruction forfeits the claim of error for purposes of appeal . . . ."  (*People v. Lee* (2011) 51 Cal.4th 620, 638 (*Lee*).)

We review the claim of instructional error de novo, considering the challenged instructions in the context of the instructions and the record as a whole "'to determine whether there is a reasonable likelihood the jury applied the instruction in an impermissible manner.'"  (*People v. Rivera* (2019) 7 Cal.5th 306, 326; *People v. Posey* (2004) 32 Cal.4th 193, 218.)  If the instructions are reasonably susceptible to an interpretation that supports the judgment rather than defeats it, we will adopt that interpretation.  (*People v. Spaccia* (2017) 12 Cal.App.5th 1278, 1287.)

Here, the trial court instructed the jury in terms of the pattern instructions CALCRIM Nos. 521 and 526, regarding premeditation and implied malice.  Appellants contend the trial court erred because these instructions do not adequately distinguish between the mental states required for first and second degree murder.  This contention has been forfeited because appellants did not object to the instructions or request that they be modified.  (*Lee, supra,* 51 Cal.4th at p. 638; *People v. Jones* (2014) 223 Cal.App.4th 995, 1001.)

Had the contention not been forfeited, we would reject it because CALCRIM No. 521 correctly defines premeditation.[3]  As our Supreme Court has explained, "In the

---

[3] The instruction states, "[A] defendant is guilty of first degree murder if the People have proved that he or she acted

14

context of first degree murder, "'premeditated" means "considered beforehand," and "deliberate" means "formed or arrived at or determined upon as a result of careful thought and weighing of considerations for and against the proposed course of action." [Citation.]' [Citation.] 'The process of premeditation and deliberation does not require any extended period of time. "The true test is not the duration of time as much as it is the extent of the reflection. Thoughts may follow each other with great rapidity and cold, calculated judgment may be arrived at quickly . . . ." [Citations.]'" (*Lee, supra,* 51 Cal.4th at p. 636; see also *People v. Houston* (2012) 54 Cal.4th 1186, 1216 (*Houston*).)

CALCRIM No. 521 is consistent with these principles because it informs the jury, "The defendant acted with *premeditation* if he or she decided to kill before completing the

---

willfully, deliberately, and with premeditation. The defendant acted *willfully* if he or she intended to kill. The defendant acted *deliberately* if he or she carefully weighed the considerations for and against his or her choice and, knowing the consequences, decided to kill. The defendant *acted with premeditation* if he or she decided to kill before completing the act that caused death. [¶] The length of time the person spends considering whether to kill does not alone determine whether the killing is deliberate and premeditated. The amount of time required for deliberation and premeditation may vary from person to person and according to the circumstances. A decision to kill made rashly, impulsively, or without careful consideration is not deliberate and premeditated. On the other hand, a cold, calculated decision to kill can be reached quickly. The test is the extent of the reflection, not the length of time." "The People have the burden of proving beyond a reasonable doubt that the killing was first degree murder rather than a lesser crime. If the People have not met this burden, you must find the defendant not guilty of first degree murder and the murder is second degree murder."

15

act that caused death." It further informs the jury that, "The length of time the person spends considering whether to kill does not alone determine whether the killing is deliberate and premeditated. . . . A decision to kill made rashly, impulsively, or without careful consideration is not deliberate and premeditated. On the other hand, a cold, calculated decision to kill can be reached quickly. The test is the extent of the reflection, not the length of time." (*Ibid*.)

Our Supreme Court has also consistently held that premeditation and deliberation can occur ""in a brief interval. . . .""" (*People v. Mendoza* (2011) 52 Cal.4th 1056, 1069 (*Mendoza*).) The test ""is not time, but reflection. "Thoughts may follow each other with great rapidity and cold, calculated judgment may be arrived at quickly.""" (*People v. Solomon* (2010) 49 Cal.4th 792, 812.)

Appellants argue that reliance on "the extent of reflection" rather than the "duration of time," collapses any meaningful distinction between a premeditated killing and one that occurs intentionally, but rashly or impulsively. The jury should, they contend, have been instructed that premeditation requires "'*substantially more reflection* than may be involved in the mere formation a specific intent to kill.'" (*People v. Boatman* (2013) 221 Cal.App.4th 1253, 1264, quoting *People v. Thomas* (1945) 25 Cal.2d 880, 900.) We are not persuaded. As our Supreme Court has often noted, thoughts may follow each other rapidly and a person can, instantaneously, make a calculated judgment to kill another. (*Ibid;* see also *People v. Potts* (2019) 6 Cal.5th 1012, 1027; *Houston, supra,* 54 Cal.4th at pp. 1216-1217; *Mendoza, supra,* 52 Cal.4th at p. 1069.)

For the same reason, we reject appellants' contention that the prosecutor committed error or misconduct in closing argument when she argued premeditation "can be made in an instant." Even if this contention had not been forfeited based on appellants' failure to raise it in the trial court, we would find no error because the prosecutor did not misstate the law. (*People v. Covarrubias* (2016) 1 Cal.5th 838, 893-894; *People v. Thornton* (2007) 41 Cal.4th 391, 454.)

Here, there was substantial evidence from which the jury could infer that appellants killed with premeditation and deliberation. First, as Lopez admitted, the robbery of Cojon was planned in advance. Appellants lured Cojon to the gas station with the promise of sex, and agreed ahead of time to rob him after he arrived. Orellana armed himself before going to the van. Lopez described Orellana stabbing Cojon because he was moving around too much during the robbery and because Orellana believed Cojon was a member of a rival gang. Cojon was stabbed in the thigh, severing his femoral artery, and then dumped in a ravine to bleed to death. The jury could infer that appellants' decisions to stab Cojon to stop him from moving and to retaliate against him for supposedly belonging to a rival gang, were the product of substantial reflection and calculation. (See, e.g., *People v. Elliot* (2005) 37 Cal.4th 453, 471 [numerous stab wounds show "preconceived design to kill"]; *People v. Koontz* (2002) 27 Cal.4th 1041, 1082 [targeting vital area of body shows premeditation].) Withholding medical treatment from Cojon and then abandoning him to bleed to death is also evidence that appellants acted with premeditation. (See, e.g., *People v. Raley* (1992) 2 Cal.4th 870, 888 [premeditation where defendant stabbed and abandoned victims to bleed to death in isolated

17

area]; *People v. Ainsworth* (1988) 45 Cal.3d 984, 1023-1024 [premeditation where defendant shot victim and allowed her to bleed to death during lengthy car ride], disapproved on another ground, *People v. Sanchez* (2016) 63 Cal.4th 665, 686, fn.13.)

4. Cumulative Prejudice. Orellana contends the cumulative effect of these errors deprived him of his federal and state constitutional rights to due process and fair trial. Because we have found no error, there is no error to cumulate. (*People v. Cardenas* (2025) 18 Cal.5th 797, 836; *People v. Camacho* (2022) 14 Cal.5th 77, 148.)

*Conclusion*

The judgments are affirmed.

NOT TO BE PUBLISHED.


YEGAN, Acting P. J.

We concur:


BALTODANO, J.


CODY, J.

18

Hayden A. Zacky, Judge

Superior Court County of Los Angeles

_____

Deborah L. Hawkins, under appointment by the Court of Appeal, for Defendant and Appellant, Lopez.

Joshua L. Siegel, under appointment by the Court of Appeal, for Defendant and Appellant, Orellana.

Rob Bonta, Attorney General, Lance E. Winters, Chief Assistant Attorney General, Susan Sullivan Pithey, Assistant Attorney General, Scott A. Taryle, Supervising Deputy Attorney General, Sophia A. Lecky, Deputy Attorney General, for Plaintiff and Respondent.